**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1726

_____

ROLANDO ENRIQUE HERNANDEZ-MARTINEZ,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA

_____

On Petition for Review of a Final Order of the
Board of Immigration Appeals
(Agency No. A216-210-914)
Immigration Judge:  Pallavi S. Shirole

_____

Argued on March 30, 2023

Before: MATEY, FREEMAN, and FUENTES, *Circuit Judges*

(Opinion filed: December 13, 2023)

Rebecca Hufstader [ARGUED]
Emily G. Thornton
Legal Services of New Jersey
100 Metroplex Drive
Suite 101
Edison, NJ 08818
        *Counsel for Petitioner*

Sarah A. Byrd
Robert P. Coleman, III [ARGUED]
James A. Hurley

Jennifer R. Khouri
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
Washington, DC 20044
        *Counsel for Respondent*

Anne K. Dutton
Hastings College of the Law
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
        *Counsel for Amicus – Center for Gender & Refugee Studies*

_____

OPINION[*]

_____

FREEMAN, *Circuit Judge*.

Rolando Enrique Hernandez Martinez petitions for review of the Board of Immigration Appeals' order dismissing his applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). For the reasons that follow, we will deny the petition as to the asylum and withholding of removal claims, and we will remand for further proceedings on the CAT claim.

I

A

Hernandez Martinez is a native and citizen of El Salvador. In late 2014, when he was 16 years old, he was playing soccer in his neighborhood of El Planon (near San Julian in the department of Sonsonate) with his brother Moises and a friend they called

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

"Chumpe." Members of the Barrio 18 gang approached Moises and Chumpe and asked them to join the gang. Both refused. On December 31, Barrio 18 gang members came to the Hernandez Martinez family's home and shot Moises and Chumpe, killing them both. Hernandez Martinez was not present during the shooting, and he later learned that Barrio 18 members had intended to kill him as well based on their assumption that he would refuse to join the gang. A few days after killing Moises and Chumpe, Barrio 18 members returned to the family's home looking for Hernandez Martinez, who was not there. A few days after that, Barrio 18 members fired gunshots into the family's home.

The police responded to both shooting incidents. However, despite requests from the family, the police did not provide the family a copy of the investigative report about Moises' homicide before the family relocated to Palo Verde.

In January 2015, after the two shooting incidents, Hernandez Martinez fled to his sister's home in Palo Verde—a neighborhood on the other side of San Julian. His father and other family members joined him in Palo Verde some months later.

Palo Verde is in the territory of the MS-13 gang—a rival to Barrio 18. While Hernandez Martinez was living in Palo Verde, members of MS-13 approached him twice and threatened to harm him if he did not join their gang. One of these threats was at gunpoint. Hernandez Martinez refused to join. He told the gang members that he had never liked gangs and that his father had told him to work legally in the fields. Because of the threats from the gang, Hernandez Martinez fled El Salvador in late 2016.

Hernandez Martinez arrived in the United States in 2017 and informed immigration officials that he feared returning to El Salvador because of the gangs that

3

had killed his brother and threatened him. He was released by immigration officials and went to live with relatives in New Jersey.

While Hernandez Martinez was living in the United States, an MS-13 member told his cousin that Hernandez Martinez would be killed by the gang if he ever returned to El Salvador. MS-13 members also threatened to harm Hernandez Martinez's younger brother, Israel, if he refused to join the gang, or if Modesto did not pay "rent" for living in their territory.

Modesto refused to pay the gang and contacted the police, who escorted the family out of Palo Verde (in the department of Sonsonate) to the neighboring department of Santa Ana. In a declaration submitted to the Immigration Judge, Modesto stated, "I live in a very remote and rural area. The only people who know where we live are my children. To this day, I don't believe that the gang members know where I live." A.R. 165. Since living in Santa Ana, the family has had no encounters with gangs.

In 2019, Hernandez Martinez was arrested for possession of marijuana and was issued a conditional discharge and assessed court costs. In November 2020, he was charged with disorderly conduct, and those charges remained pending at the time of his removal proceedings.

In April 2021, Hernandez Martinez was arrested during a fight with his uncle and cousins. He was charged with aggravated assault with a deadly weapon (namely, a folding knife) and related charges. That arrest led to the removal proceedings at issue here.

B

4

In April 2021, the Department of Homeland Security served Hernandez Martinez with a Notice to Appear in removal proceedings, charging him as removable under the Immigration and Nationality Act § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i) as a noncitizen present in the United States without being admitted or paroled. Hernandez Martinez conceded removability, and applied for asylum, withholding of removal, and relief under the CAT.[1] He alleged that he would suffer future persecution based on his political opinion opposing gangs and his membership in several particular social groups (PSGs), including (1) "young Salvadoran men," (2) "Salvadoran men," (3) "Salvadoran men who took concrete steps against gang authority," (4) "young Salvadoran men who have been actively recruited by gangs and who have refused to join the gangs because they oppose gangs," (5) "immediate family members of gang homicide victim Moises Hernandez Martinez," and (6) "immediate family members of Modesto Hernandez." A.R. 616–25.

In support of his application, Hernandez Martinez submitted his own declaration and one from his father; a letter from his brother-in-law, who is a police officer in El Salvador; and country conditions evidence, including an expert report on crime, gangs, and other security issues in El Salvador.

In July 2021, an Immigration Judge (IJ) held a hearing at which Hernandez Martinez testified. In August 2021, the IJ issued an opinion denying all three forms of

---

[1] Although the application was filed more than one year after his arrival in the United States, it was considered timely under the class action settlement in *Mendez-Rojas v. Wolf*, No. 2:16-cv-01024-RSM, ECF No. 79-1 (W.D. Wash. July 28, 2020).

relief.  The IJ found Hernandez Martinez credible, found corroboration for his claims, and found that he had suffered past persecution at the hands of Barrio 18 and MS-13.  But she determined that he failed to show a nexus between the persecution and a statutorily protected ground.

Although the IJ determined that Hernandez Martinez is a member of the cognizable PSG "immediate family members of gang homicide victim Moises Hernandez Martinez," she concluded that the gangs targeted Hernandez Martinez "not for his relationship with Moises but because of his presumed resistance to gang recruitment." A.R. 70–71.[2]  She found the remaining proposed PSGs non-cognizable, and she held that the record did not support a conclusion that the gangs perceived Hernandez Martinez's resistance as political expression.

As a result of these holdings, the IJ determined that Hernandez Martinez was not entitled to a presumption of future persecution.  And the IJ determined that he could not otherwise establish a well-founded fear of future persecution.

The IJ further determined that Hernandez Martinez had failed to show that the government was unable or unwilling to control the gang members, given that the police responded to the shootings in El Planon and escorted Modesto from Palo Verde to a location in Santa Ana.  For all these reasons, the IJ denied the asylum application, which

---

[2] The IJ also found that "immediate family members of Modesto Hernandez" is a cognizable PSG, but Hernandez Martinez does not pursue that PSG in his petition to us.

6

necessarily resulted in her denial of withholding of removal.[3]  And she denied protection under the CAT because she determined that Hernandez Martinez did not demonstrate a likelihood of torture upon his return to El Salvador.

Hernandez Martinez appealed to the Board of Immigration Appeals (BIA), which issued an opinion dismissing the appeal.  The BIA agreed with the IJ's determinations that Hernandez Martinez was not persecuted on account of political opinion or membership in any of his proposed PSGs.  It also agreed that Hernandez Martinez had not shown the Salvadoran government was unable or unwilling to protect him from his persecutors.  Lastly, it affirmed the IJ's denial of withholding of removal and protection under the CAT.

Hernandez Martinez timely petitioned this Court to review the BIA's decision.

II

The BIA had jurisdiction under 8 C.F.R. § 1003.1(b)(3).  We have jurisdiction under 8 U.S.C. § 1252(a)(1).  *Quinteros v. Att'y Gen.*, 945 F.3d 772, 780 (3d Cir. 2019).  When the BIA issues a written decision on the merits, we review its decision and not the decision of the IJ.  *Id.* at 780–81.  But we also review the portions of the IJ decision that the BIA adopts or defers to.  *Id.* at 781.

We review the agency's legal determinations de novo, subject to *Chevron* deference.  *Huang v. Att'y Gen.*, 620 F.3d 372, 379 (3d Cir. 2010).  This includes whether

---

[3] The IJ also opined that, assuming Hernandez Martinez demonstrated eligibility, she would deny a discretionary grant of asylum.  The BIA did not rely on that determination, and it is not at issue here.

the BIA applied the legal standards correctly and the sufficiency of the BIA's findings. *Quinteros*, 945 F.3d at 786.

We review the agency's findings of fact—including its conclusions regarding past persecution—under a deferential substantial-evidence standard. *Chavarria v. Gonzalez*, 446 F.3d 508, 515 (3d Cir. 2006). We do not disturb the agency's decisions unless "the evidence is such that a reasonable factfinder would be compelled to conclude otherwise." *Id.* The agency's decision must be supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* Findings that mischaracterize or understate the nature of the evidence are not supported by substantial evidence. *Doe v. Att'y Gen.*, 956 F.3d 135, 140 (3d Cir. 2020). The BIA is not permitted to ignore or misconstrue evidence in the applicant's favor. *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d 101, 107 (3d Cir. 2010). If the BIA errs in its review of the IJ's decision, we remand unless "it is highly probable that the error did not affect the outcome of the case." *Li Hua Yuan v. Att'y Gen.*, 642 F.3d 420, 427 (3d Cir. 2011).

### III

Hernandez Martinez raises four arguments in his petition: (1) that the agency erred in finding no nexus between his past persecution and his anti-gang political opinion or his membership in the PSG "immediate family members of gang homicide victim Moises Hernandez Martinez," (2) that the BIA erred in making a nexus determination about his other proposed PSGs when the IJ had not done so in the first instance, (3) that the agency erred in concluding he did not show the Salvadoran government was unable or unwilling

8

to protect him from persecution, and (4) that the agency applied the wrong legal standard to his CAT claim.

We conclude that substantial evidence supported the agency's conclusion that the Salvadoran government is not unable or unwilling to protect Hernandez Martinez from future persecution. As a result, we need not reach the remaining arguments regarding asylum and withholding or removal, and we will deny the petition as to those claims. However, we will grant the petition as to the CAT claim and remand for further proceedings.

*A. Asylum and Withholding of Removal*

To qualify for asylum, an applicant must meet the definition of a refugee. 8 U.S.C. § 1158(b)(1)(A). That is, he must be "unable or unwilling" to return to his country of origin because of "[past] persecution or a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

To establish past persecution, an applicant must show "(1) an incident, or incidents, that rise to the level of persecution; (2) that is on account of one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either unable or unwilling to control." *Abdulrahman v. Ashcroft*, 330 F.3d 587, 592 (3d Cir. 2003) (cleaned up). Establishing past persecution results in the presumption of a well-founded fear of future persecution. *Id.* Absent past persecution, "an applicant can demonstrate that she has a well-founded fear of future persecution by

9

showing that she has a genuine fear, and that a reasonable person in her circumstances would fear persecution if returned to her native country." *Id.* (cleaned up).

An applicant who fails to qualify for asylum is necessarily ineligible for withholding of removal, which is governed by a more demanding standard. *Valdiviezo-Galdamez v. Att'y Gen*, 663 F.3d 582, 591 (3d Cir. 2011).

When the agency conducted its asylum analysis, it found that the threats Barrio 18 and MS-13 made against Hernandez Martinez rose to the level of persecution. But it found that Hernandez Martinez did not satisfy the second or third requirements of a past-persecution showing. Because we hold that substantial evidence supported the agency's determination about the third requirement, we need not reach the second.

Based on the record as a whole, we cannot conclude that a reasonable factfinder would be compelled to conclude that the Salvadoran government is unable or unwilling to protect Hernandez Martinez from his persecutors. When the IJ considered the Salvadoran government's unwillingness or inability to protect Hernandez Martinez, she relied on evidence that police in El Planon responded and investigated the gang members' killing of Moises and subsequent shooting at the family home. The IJ also relied on evidence that, after MS-13 threatened and extorted Modesto in Palo Verde, police helped Modesto relocate to a remote area in Santa Ana, where Modesto has lived with his younger son without incident. The IJ recognized that the El Planon police had not completed their investigation into the shootings before the family relocated, but she concluded that the police responses in El Planon and Palo Verde showed their ability and willingness to control private actors in regard to Hernandez Martinez's family.

10

The BIA affirmed, and it stated in its decision that the IJ considered country conditions evidence. Hernandez Martinez is correct that the IJ did not discuss country conditions evidence in this section of her opinion. But elsewhere in her opinion the IJ stated that she considered all evidence in the record. *See Quinteros*, 945 F.3d at 786 (stating that it is usually but not always sufficient for an IJ to say that all evidence and testimony has been considered). And based on our review of the entire evidentiary record, we conclude that the IJ's decision is supported by substantial evidence.

Hernandez Martinez contends that the country conditions evidence in the record demonstrates that the government cannot protect him from the gangs. He argues that country conditions evidence is especially important in cases like his, where he did not report the MS-13's threats against him because of government corruption and his fear of harm from the police. He invokes *Doe*, 956 F.3d at 146, and argues that the absence of a report to police leaves a gap in proof about how the government would respond if asked and permits him to fill in the evidentiary gap in other ways. But Hernandez Martinez's family did make reports to police. When the gangs shot his brother and days later shot at the family home, the police responded to and investigated both shootings. And although the police in El Planon did not provide a report of their investigation before the family relocated, these facts do not compel a conclusion that the police were unwilling or unable to control the gangs.

Even if we apply *Doe*'s gap-filling method to Hernandez Martinez's unreported threats in Palo Verde, there is substantial evidence supporting the agency's determination. *Doe* instructs us to ask whether Hernandez Martinez has "show[n] that

11

others have made reports of similar incidents to no avail." *Id.* at 146. He has not done so. Although country conditions evidence addresses the general difficulty of relocating to avoid gangs in El Salvador, the record shows that police escorted Hernandez Martinez's father and younger brother from Palo Verde to a remote region where they have lived without incident.

We recognize that the record includes country conditions evidence that the Salvadoran government is generally unable or unwilling to control gangs. But "a government's inability or unwillingness to control a violent group as a general matter does not necessarily mean that the government cannot or will not protect the specific applicant." *Galeas Figueroa v. Att'y Gen.*, 998 F.3d 77, 89 (3d Cir. 2021). And substantial evidence in the record specific to Hernandez Martinez and his immediate family members supports a conclusion that the government is not unwilling or unable to protect him.[4] Accordingly, we deny the petition as to the asylum and the withholding of removal claims.

*B. Convention Against Torture*

To qualify for protection under the CAT, an applicant must establish (1) that it is more likely than not that he would be tortured if removed, and (2) that public officials will commit or acquiesce in the likely torture. *Myrie v. Att'y Gen.*, 855 F.3d 509, 515 (3d Cir. 2017). The first prong of a CAT claim includes two sub-questions: (a) what is likely

---

[4] Hernandez Martinez's police-officer brother-in-law's opinion (provided without reasoning) that Hernandez Martinez's life would be in danger in El Salvador does not alter our conclusion.

to happen to the applicant if removed, and (b) whether what is likely to happen amounts to the legal definition of torture. *Quinteros*, 945 F.3d at 786–87. The first sub-question is factual and is reviewed by the BIA for clear error. *Myrie*, 855 F.3d at 516. The second sub-question is legal and gets de novo review from the BIA. *Id.*

Here, the agency resolved the CAT claim on the first prong (the likelihood of torture), so it did not address the second prong (the role of public officials). And we assess the agency's decision "solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

The IJ determined that Hernandez Martinez had not demonstrated it is more likely than not he would be tortured if returned to El Salvador. In support, the IJ made several factual findings, including that Hernandez Martinez "has not received any threats since his departure from El Salvador, and there is no indication either gang remembers who he is or why he is significant to them." A.R. 77.

On appeal, the BIA affirmed the IJ's conclusion, but it did so by making de novo findings of fact—something it is not permitted to do. *Kaplun v. Att'y Gen.*, 602 F.3d 260, 271 (3d Cir. 2010). For example, the BIA said that the IJ discredited Hernandez Martinez's written declaration that a gang member conveyed a threat to him after he left El Salvador, and it purported to explain why the IJ did so. But the IJ had *positively* credited Hernandez Martinez as a witness, without distinguishing between his oral testimony and sworn, written statements. The BIA failed to recognize that the IJ simply did not acknowledge Hernandez Martinez's declaration that a gang member conveyed a

13

threat to him after he left El Salvador.[5]  The IJ similarly failed to acknowledge

Hernandez Martinez's testimony that gang members inquired about him after he left El

Salvador, and the country conditions evidence that gangs pursue their past targets upon

repatriation.

Because the BIA engaged in improper fact-finding and the IJ found facts while

ignoring evidence favorable to Hernandez Martinez, the agency's CAT findings were not

supported by substantial evidence.  *See Ghanem v. Att'y Gen.*, 14 F.4th 237, 249 (3d Cir.

2021).  And we cannot conclude that the error was harmless.  *Li Hua Yuan*, 642 F.3d at

427.  The IJ credited evidence that gangs conveyed a threat to Hernandez Martinez and

made inquiries about him after he left El Salvador.  Those facts indicate that the gangs

remember Hernandez Martinez and how he spurned them.  The agency must consider

those facts along with the country conditions evidence that gangs "wreak[] their

vengeance" upon their enemies who return to El Salvador on ICE-chartered flights.  A.R.

233–34; 8 C.F.R. § 1208.16(c)(3)(iv); *Quinteros*, 945 F.3d at 786 ("[I]f evidence is to be

disregarded, we need to know why." (cleaned up)).  So we will remand for the agency to

consider "all evidence relevant to the possibility of future torture."  8 C.F.R. §

1208.16(c)(3).[6]

_____

[5] Hernandez Martinez's testimony that no members of MS-13 had personally threatened him after he left El Salvador does not necessarily contradict his written testimony that gang members used his cousin as an intermediary to threaten him.

[6] Judge Matey does not join Part III.B of the opinion and would dismiss the petition. Assuming, without holding, that the BIA's decision veered from the IJ's fact-finding, he would conclude that any error is harmless. *Li Hua Yuan*, 642 F.3d at 427.  Here, "the BIA echoed and adopted several" of the IJ's factual findings, making it "highly probable

\*     \*     \*

For the reasons stated above, we will deny the petition as to the asylum and withholding of removal claims, grant the petition as to the CAT claim, and remand for further proceedings consistent with this opinion.

---

that the outcome . . . would not have been different had the BIA applied the proper standard of review." *Id*. at 428